WASHINGTON, The (ULARY v.). See Case No. 14,323.

WASHINGTON (UNITED STATES v.). See Case No. 16,646.

## Case No. 17,235.

### WASHINGTON v. WALKER.

[2 Cranch, C. C. 293.] [1]

Circuit Court, District of Columbia. April Term, 1822.

COLLECTOR OF TAXES — LIABILITY ON BOND — ARREARAGES COLLECTED.

The collector of city taxes who was appointed and gave bond in June, 1816, and resigned in October, 1816, was liable upon that bond for all collections of taxes made by him after the date of the bond, and before his resignation, although such collection consisted of arrearages of taxes due in former years.

Debt on a collector's bond. There were several breaches assigned in not paying over the money collected. The bond was dated in June, 1816, and the defendant resigned his office in October, 1816, before the tax list of that year had been delivered to him. He had been collector for several preceding years.

Mr. Law and Mr. Key, for plaintiffs, contended that, as the defendant had been collector in preceding years, his sureties in this bond are liable for collections made in former years.

WASHINGTON (WARD v.). See Case No. 17,163.

## Case No. 17,236.

### WASHINGTON et al. v. WASHINGTON et al.

[3 Cranch, C. C. 77.] [1]

Circuit Court, District of Columbia. April Term, 1827. [2]

PAYMENT OF LEGACY — ASSIGNMENT OF BOND — EFFECT.

A legatee under the will of General George Washington received by assignment from the executors, on account of his legacy, a bond and mortgage taken by them from a purchaser of the estate, which bond was for a sum larger than the legacy. The assignee covenanted not to hold the executors liable upon their assignment, and to pay back the surplus, and to indemnify and save harmless the executors from any damage by reason of the assignment. The obligor became insolvent, and the sales of the mortgaged property did not produce the amount of the legacy;—held. that the estate of General Washington was not liable under the 41st section of the act of Virginia, of December 13, 1792, to make good to the legatee the deficiency; and upon a cross-bill he was held liable to the executors for the amount in which the assigned debt exceeded the legacy.

This was an amicable suit brought by certain residuary legatees [Lawrence A. Washington and others] under the will of General George Washington of Mount Vernon, to enable the executors to settle the estate. There was also a cross-bill filed by the executors against some of those residuary legatees who had purchased at the sales of the property, or had otherwise received more than the value of their respective legacies. The original bill by the legatees against the executors, which is principally in the handwriting of the late

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reversed in 1 How. (42 U. S.) 14.]

Mr. Justice Bushrod Washington, one of the acting executors, states, "that General George Washington departed this life some time in the year 1799, having first duly made and published his last will and testament, bearing date the 9th of July, 1799, whereby, among other things he devised all the rest and residue of his estate, real and personal, not before disposed of by the said will to be sold by his executors, and the money arising therefrom to be divided into twenty-three equal parts, and applied as follows, to wit: to William A. Washington," &c., &c., naming the several legatees. The bill states further, that a considerable part of the western lands which was susceptible of partition, as also other parts of the personal property, were divided among the said devisees in specie according to the proportions stated in the will. That the residue of the estate real and personal, a small part excepted, was sold by the two acting executors, the said Bushrod Washington and Lawrence Lewis, but to what amount the complainants are ignorant. They admit that considerable payments have been made to them by the executors, but they charge that a large sum still remains to be distributed, which the acting executors refuse to pay without the sanction of a court of equity. The bill then sets forth the names of all the residuary legatees and their assignees, and the personal representatives of such as had died; prays that the defendants may render an account of the sales of the property, and of the assets which have come to their hands, or which are still to be collected; and that the amount to which the complainants are respectively entitled may be ascertained, and that the defendants may be decreed to pay the same. The defendants answered, admitting the facts stated in the bill, and submitting to account, &c. By consent, the cause was referred to a master commissioner, to state and report an account, &c. Upon his report it appeared that the only case of difficulty was that of Thomas Hammond, who, as one of the residuary legatees, in right of his wife, was entitled to one whole share. that is, 1/23 of the amount of the sales of the property, which share was $5.179.09. Before this amount was ascertained, the executors assigned to him a mortgage, given to the executors by Burdett Ashton, Jr., (who was also entitled to 2/3 of a share,) to secure a debt of $9,410.20; which sum was supposed, after deducting Ashton's 2/3 of a share, to be more than sufficient to pay the share due to Hammond, who accordingly gave the executors a mortgage upon his lands, to secure the refunding of the surplus; in which mortgage he covenanted to pay the same, and to indemnify and save harmless the executors from any damage, by reason of the assignment. There was, also, upon the assignment to Hammond of Ashton's mortgage, a memorandum, that the executors were not to be held liable as assignors. The property mortgaged by Ashton was sold under a decree of foreclosure, and did not produce enough to pay the legacies of Ashton and Hammond; whereupon Hammond claimed to have the deficiency made up by the estate of General Washington, under the 41st section of the Virginia act of the 13th of December, 1792, which obliges the executors to sell perishable articles, and authorizes them to take bonds and security from the purchasers; "and if more be sold than will pay the debts and expenses, the executor or administrator may assign the bonds, for the surplus, to those entitled to the estate, and be discharged as to so much; and if, after such assignment, the obligor becomes insolvent, so as the money be lost, without the fault or neglect of the assignee, then such loss shall be made good to the assignee out of the decedent's estate."

CRANCH, Chief Judge. The master commissioner, (A. Moore,) in his report, has referred to the court the claim of Thomas Hammond, in right of his wife, to 1/23 of the residuum of General Washington's estate. In the fifth article of his will he desires that all the residue of his estate, real and personal, may be sold by his executors, (if it cannot be equally and satisfactorily divided,) and the money divided into twenty-three equal parts, of which Mrs. Hammond was entitled to 1/23, and Burdett Ashton to 2/3 of 1/23. A share was $5,179.05. Burdett Ashton had purchased at the sale to the amount of $9,410.20, and was entitled to a credit of his 2/3 of 1/23, which was not then ascertained, but afterwards appeared to amount to $3,452.70. He gave a mortgage on the 12th of March, 1805, for the whole amount of his purchase, $9,410.20; which, after deducting from it his 2/3 of 1/23, was supposed to be more than sufficient to pay Mrs. Hammond's share. The executors, on the 11th of March, 1806, assigned to Hammond, Burdett Ashton's debt and mortgage; and, on the same day, took from Hammond a mortgage to refund to the executors the surplus, after deducting Hammond's share from the balance of Ashton's debt, thus assigned to Hammond.

Upon or under the assignment of Ashton's mortgage was written a memorandum, that the executors were not to be made personally liable in any respect, or on any pretence whatever, for or by reason of that assignment; and that Burdett Ashton was to have credit for his proportion of $5,179.05, (being the share of each legatee,) as well as for his sister's proportion; and one of the conditions of Hammond's mortgage was, that he should indemnify and save harmless the executors, against all claims, demands, or damages whatsoever, on account or by reason of the assignment and transfer of the aforesaid debt to him, the said Thomas Hammond, and to refund in case he should be liable so to do. He covenanted, also, to the same effect. The property mortgaged by Ashton

was sold under a decree, and produced only $3,908.46.

The debt of Ashton was........... $9,410 20
He had a right to retain.......... 3,452 70

The real amount of Ashton's debt was $5,957 50
Hammond's claim was............. 5,179 05

The amount secured to the executors by Hammond's mortgage was..... $ 778 45

This sum of $778.45 then was, by the terms of the mortgage, to be absolutely paid by Hammond to the executors, whether Ashton became insolvent or not, or whether the land produced more or less than Hammond's claim. Such was his covenant. We therefore think that he could not have had recourse to the executors, even if he had not expressly exonerated them.

But it is said that the estate is not exonerated, although the executors are; and that the estate is liable, as assignor of Ashton's debt, under the equity of the 41st section of the statute of Virginia, of December 13, 1792, (P. & P. Rev. Code, 165,) which compels the distributees to take the specific bonds of purchasers of the personal estate, when sold because perishable; in which case, if the bonds are not good, they are to be made good out of the estate. It is admitted that the present case is not within the letter of the statute, and we think it is not within its spirit; for here the debt of Ashton was voluntarily received in payment. Hammond was not obliged to receive it. We think that General Washington's estate is not bound to make it good, and that the executors may recover from Hammond the difference between Ashton's debt and Hammond's share of the estate.

MORSELL, Circuit Judge, concurred. THRUSTON, Circuit Judge, not having heard the argument, gave no opinion.

A decree was afterwards rendered in conformity with this opinion.

Reversed by the supreme court, in 1843. 1 How. [42 U. S.] 14.